IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

MATTHEW RILEY, et al.                                                    PLAINTIFFS

v.                                          CIVIL ACTION NO. 2:09-CV-148-KS-MTP

FORD MOTOR COMPANY, et al.                                           DEFENDANTS

## MEMORANDUM OPINION AND ORDER

The Court now considers Defendant Ford Motor Company's Motion to Exclude the
Testimony of Steven E. Meyer and for Summary Judgment [150]. For the reasons stated below, the
motion is denied.

## I. BACKGROUND

This is a wrongful death and product liability action stemming from an automobile accident
on November 3, 2006. The Riley family was traveling east on Highway 98 in Marion County,
Mississippi, in a 2002 Ford Explorer XLS. Plaintiff Matthew Riley was driving. Plaintiff Carmen
Riley occupied the front passenger seat, while their children, Plaintiffs C.R. and A.R., sat in the back
seat. All Plaintiffs were wearing seat belts.

Another vehicle attempted to pass Plaintiffs' Explorer and made contact with it. Plaintiffs'
vehicle went off the road and overturned. All Plaintiffs suffered serious injuries. Carmen Riley and
A.R. were partially ejected from the vehicle. Carmen Riley suffered serious and permanent injuries,
while A.R. was killed.

In their First Amended Complaint, Plaintiffs advanced a variety of claims implicating both

the Mississippi Products Liability Act ("MPLA")[1] and Mississippi's wrongful death statute.[2] They alleged that the Explorer's restraint system failed as a result of design and manufacturing defects. They further alleged that its door latch system failed, and that its windows were not properly glazed. Finally, they alleged that Defendants failed to warn of the danger caused by the alleged defects. They included the following causes of action: strict liability, negligence, and failure to recall and/or retrofit. Finally, they seek a variety of damages, including punitive damages; medical expenses; lost earnings; and compensation for pain, suffering, and emotional distress.

In an order [267] entered June 23, 2011, the Court granted in part and denied in part Ford's Motion for Partial Summary Judgment [152]. The Court granted the motion as to: the MPLA claims and emotional damages claims of Plaintiffs C.R. and Matthew Riley; Matthew Riley's lost wages claims; all Plaintiffs' warning defect claims; all Plaintiffs' claims stemming from alleged defects in the door latch system and window glazing; and all Plaintiffs' claims stemming from Defendants' alleged failure to recall or retrofit the vehicle. However, the Court denied the motion as to: Matthew Riley and C.R.'s claims for loss of companionship and society; Matthew Riley and C.R.'s claims for damages attributable to the injuries and/or death of A.R. to which they were entitled as wrongful death beneficiaries; and all Plaintiffs' negligence claims. Finally, the Court held that Plaintiffs had not properly plead any bystander liability claim, and, therefore, no such claim was before the Court.[3]

The Court also granted in part and denied in part [268] Ford's Motion to Strike [244] the

---

[1]MISS. CODE ANN. § 11-1-63.

[2]MISS. CODE ANN. § 11-7-13.

[3]The Court later denied [276] Plaintiffs' motion to file a Second Amended Complaint which included a bystander liability theory.

affidavit of Steven Meyer attached to Plaintiffs' response [231] to Ford's Motion to Exclude [150] Meyer's testimony. The Court denied the motion as to: Meyer's testimony addressing belt spool-out; Meyer's testimony that belt spool-out generally occurs in rollover accidents; Meyer's testimony regarding other similar incidents of mounting bracket failure; Meyer's discussion of certain spit test data which allegedly displayed the effects of anchor deformation; Meyer's general observations regarding the strength of an aluminum rivet, including his assistant's "testing" the rivet by applying force by hand; and Meyer's discussion of belt geometry. The Court granted the motion as to: Meyer's testimony regarding other specific incidents of belt spool-out; Meyer's testimony regarding other specific incidents of retractor failure; Meyer's testimony regarding other similar incidents of B-pillar deformation, C-pillar deformation, and D-ring movement; any calculations, testing, or analysis regarding the strength of any aluminum rivet that was not timely disclosed to Defendants, including Meyer's discussion of tensile strength ratings; and Meyer's belt geometry diagrams.

## II. FORD'S MOTION TO EXCLUDE MEYER'S TESTIMONY

### A.    *Meyer's Opinions*

The conclusion of Meyer's expert opinion is that A.R.'s seat belt was too loose, allowing her to partially eject from the vehicle. A.R. was in the rear passenger-side seat. Meyer asserts that the belt's slack was caused by three factors: 1) failure of a mounting bracket, 2) pillar deformation, and 3) retractor failure and resultant belt spool-out. All of these opinions were disclosed in Meyer's Preliminary Report [231-3], and he discussed them during his deposition [231-4].

First, Meyer asserts that a mounting bracket failed. The seat belt was secured at three points: upper outboard, lower outboard, and inboard. The inboard anchor point is where an occupant would buckle the seat belt. The female end of the buckle assembly was attached to the floor pan of the

3

vehicle by a metal stalk. A.R.'s buckle stalk was attached to a similar metal stalk for the center buckle position by an aluminum rivet. Both buckle stalks were attached to the floor pan with two metal bolts. During the accident, the aluminum rivet connecting the two metal stalks broke. Meyer asserts that the rivet's failure allowed A.R.'s buckle stalk to bend in an outboard direction, creating approximately five inches of additional slack in the seat belt.

Next, Meyer asserts that deformation of the vehicle's structure caused additional slack. The upper outboard anchor point was a D-ring attached to the vehicle's C-pillar. Meyer stated that the accident caused the C-pillar to bend in an inboard direction. Meyer contends that the seat belt's upper outboard anchor point moved inward with the deformed pillar, creating up to five inches of additional slack in the belt.

Finally, Meyer argues that an additional one to two inches of seat belt slack was created by spool-out. The seat belt system employs a retractor device which, upon a sufficiently strong acceleration of the belt, will lock up the belt spool. Once the belt locks up, it is unable to spool out any further and create additional slack. Meyer argues that the retractor in the subject vehicle is susceptible to unlocking by vertical and/or rotational acceleration. He contends that even a momentary failure in the retractor could allow significant belt spool-out. He believes that the retractor in A.R.'s seatbelt assembly failed to remain locked during the accident.

### B.   Daubert *Standard*

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3)

the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Expert testimony "serves to inform the jury about affairs not within the understanding of the average man." *United States v. Moore*, 997 F.2d 55, 57 (5th Cir. 1993). Therefore, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). "Whether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, who is in the best position to determine both the claimed expertise of the witness and the helpfulness of his testimony." *Sullivan v. Rowan Cos.*, 952 F.2d 141, 144 (5th Cir. 1992).

"[W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). In *Daubert*, the Supreme Court provided a nonexclusive list of "'general observations' intended to guide a district court's evaluation of scientific evidence," including: "'whether [a theory or technique] can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' the 'known or potential rate of error,' and the 'existence and maintenance of standards controlling the technique's operation,' as well as 'general acceptance.'" *Id.* at 989 (quoting *Daubert*, 509 U.S. at 593-94, 113 S. Ct. 2786). The Fifth Circuit Court of Appeals has observed:

> Not every guidepost outlined in *Daubert* will necessarily apply to expert testimony based on engineering principles and practical experience, but the district court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" is no less important.

5

*Id.* at 990-91 (quoting *Daubert*, 509 U.S. at 592-93, 113 S. Ct. 2786).

The reliability of proposed expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). "[T]he expert's testimony must be reliable at each and every step or it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 725 (5th Cir. 2009) (alteration original). Therefore, "[t]he . . . reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

"Overall, the trial court must strive to ensure that the expert, 'whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* The testimony must be supported by "more than subjective belief or unsupported speculation." *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786). While the Court should focus solely on the proposed expert's "principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

While the Court must "ensure expert witnesses have employed reliable principles and methods in reaching their conclusions," it does not judge the proposed experts' conclusions. *Guy v.*

*Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at 1077. Nonetheless, "[t]he proponent of expert testimony . . . has the burden of showing that the testimony is reliable," *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004), and must establish the admissibility requirements "by a preponderance of the evidence." *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

C.     *Meyer's Methodology*

Ford's *Daubert* motion concerns Meyer's testimony as to the alleged design defect in the mounting bracket of A.R.'s buckle assembly. As explained above, Plaintiffs' proposed expert, Steven E. Meyer, intends to testify that the 2002 Ford Explorer's rear passenger-side buckle assembly was defectively designed. To make out a design defect claim under the MPLA, a plaintiff must prove, among other things, that "there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." MISS. CODE ANN. § 11-1-63(f)(ii). Accordingly, Meyer proposed the rear passenger-side buckle assembly utilized in the 2000, 2003, and 2004 Ford Explorers as a feasible alternative design that would have prevented A.R.'s death.

Meyer argues that the alternative design would have prevented the seat belt's buckle from moving five inches in an outboard direction. The key difference between the subject design and the

alternative design is the length of the buckle stalk. In the subject design, the stalk is approximately nine inches from the floor pan to the top of the female end of the buckle. In the alternative design, the stalk is only three and three fourths inches long. Meyer proposes that the alternative design, if bent outboard during an accident, would allow approximately three inches less lateral displacement of the occupant. Further, he contends that the alternative design would withstand a higher occupant load before bending.

Ford contends that Meyer's testimony as to the feasibility of the alternative buckle assembly design is unreliable because it was not the product of a valid, scientific methodology. Ford contends that the only basis for Meyer's opinion is his viewing photographs of other bracket assemblies. Ford also contends that Meyer's opinion as to the proposed alternative designs is unreliable because Meyer performed no calculations, analysis, or testing to support his opinion that the alternative assemblies would have prevented the harm.

Of course, Plaintiffs disagree, arguing that Meyer's opinion as to the proposed alternative design is based upon a wide variety of records, field data, and testing, including: scene photographs; vehicle photographs; deposition transcripts; an inspection of the vehicle; schematics for the subject vehicle's seatbelt system and the alternative design; visual inspection of the subject vehicle's seatbelt system and the alternative design; analysis of other similar incidents; analysis of government-sponsored rollover tests; accident reconstruction analyses; peer-reviewed publications and studies regarding rollover accident investigation and restraint system analyses; his own experience in testing and researching restraint systems; and a study utilizing a surrogate of similar stature to Plaintiff A.R.

"The proper methodology for proposing alternative designs includes more than just conceptualizing possibilities." *Guy*, 394 F.3d at 327 (punctuation omitted). "Testing is not an

absolute prerequisite to the admission of expert testimony on alternative designs, but Rule 702 demands that experts adhere to the same standards of intellectual rigor that are demanded in their professional work." *Watkins*, 121 F.3d at 990 (punctuation omitted). This Court has previously considered the "use of the proposed design alternative for the same purpose in the same consumer market" when assessing the reliability of expert testimony. *Std. Fire Ins. Co. v. Broan Nutone, LLC*, No. 2:07-CV-44-KS-MTP, 2008 U.S. Dist. LEXIS 107030, at *16 (S.D. Miss. July 1, 2008). In the same case, the Court admitted the testimony of a proposed expert who had "carefully detailed" the causes of a fire and described how his proposed alternative design would have prevented it. *Id.* at *17-*18. The Court observed: "While it might be the best practice for an expert to actually test the proposed design alternative, omitting this step does not render the expert's conclusions automatically invalid under the *Daubert* standard." *Id.* at *18.

In *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194-95 (5th Cir. 2006), the Fifth Circuit held that a district court did not err in admitting expert testimony under circumstances similar to these. *Hodges* was a Texas case stemming from an automobile accident in which a tractor-trailer jack-knifed down an embankment. *Id.* at 191-92. The truck driver was ejected through the passenger-side door, sustaining serious injuries. *Id.* at 192. The manufacturer argued that the district court improperly denied a *Daubert* motion as to the driver's proposed expert. *Id.* at 195. The expert "described in detail the [door] latch at issue and how, and why, the proposed alternative latch would be safer." *Id.* at 196. He also "examined several hundred door-latch patents on file with the Patent and Trademark Office to determine whether suitable alternative designs existed." *Id.* He conducted force tests and compared the alternative designs' performance to that of the subject design. *Id.* Based on that analysis and the circumstances of the accident, he "calculated the maximum amount of force

required before deformation of the Mack latch would break it," and he concluded that an alternative design would have prevented the plaintiff's injuries. *Id.* He further testified that, based on his experience, the subject latch was weaker than most latches employed in similar vehicles, and he testified that it would be easy and inexpensive to replace it with a safer alternative. *Id.* at 197. The Fifth Circuit held that the district court did not err in admitting such testimony, and that it was sufficient to meet the plaintiff's burden under Texas product liability law. *Id.* at 195, 197.

In the present case, Meyer inspected the subject vehicle and noted markings, abrasions, and other indicators of where and to what extent force was applied to the various parts of the restraint system. He examined research and development documents from at least one other automobile manufacturer to see how rollover accidents were addressed when designing a restraint system, and he relied upon several studies, reports, and articles regarding rollover accidents and restraint system design. He relied upon several restraint system design patents and the technical specifications for the 2000, 2003, and 2004 Ford Explorers – all of which employed the alternative design he proposes.

Meyer removed certain parts of the restraint system from the subject vehicle to more closely inspect them. He conducted a surrogate study, in which he placed a child of height, weight, and age similar to A.R.'s in a 2003 Ford Explorer. He testified that there were no significant differences in the measurements or geometry of the 2003 Explorer (the exemplar vehicle) and the 2002 Explorer (the subject vehicle).[4] Once the surrogate was in the exemplar vehicle, he took measurements of relevant components of the restraint system to compare to the markings in the subject vehicle. After taking measurements of both the subject vehicle and the exemplar vehicle, he calculated the buckle stalk's displacement and the resulting displacement of an occupant. He noted that his assistant

---

[4]Ford's expert, Pearson, relied upon a surrogate study employing a 2000 Explorer.

inadvertently broke an exemplar rivet – similar to the one used to connect the two buckle stalks to one another in the subject vehicle – during his examination.

Meyer examined photographs of the restraint systems employed in the 2000, 2003, and 2004 Explorers. While he did not physically inspect the alternative design in preparation for his deposition or before preparing his preliminary report, he testified that he has several models of the Explorer at his facility that he has tested over the years, and that he is familiar with their restraint systems, viewing them regularly for various reasons. He did not test the mounting bracket configuration employed in the 2000, 2003, or 2004 model Explorer, but he calculated the lateral displacement that would occur if the alternative design were bent in the same manner as the subject design was in the accident. According to his calculations, the alternatives design would allow less lateral displacement, due to the shorter stalk length.

The Court believes this case is similar to *Hodges*, in which the proposed expert described a subject design in detail, looked at potential alternative designs, compared the performance of each design in a force test, calculated the maximum force that would cause each design to fail, and then concluded that his alternative design was safer. *Id.* In the present case, Meyer examined the technical specifications of the alternative buckle assembly, examined the subject vehicle, conducted a surrogate study to provide a baseline for his calculations, and then calculated the maximum lateral displacement allowed by each design. Ford makes much of the fact that Meyer did not conduct any tests of the alternative design, but Meyer's failure to test the alternative design is not, by itself, sufficient to bar his testimony. *Watkins*, 121 F.3d at 990. Furthermore, Ford argues that Meyer's opinions concerning the proposed alternative design are unreliable, despite the fact that Ford employed the proposed alternative design in at least three Explorer models. *Std. Fire Ins. Co.*, 2008

U.S. Dist. LEXIS 107030 at *16.[5]

Meyer's methodology is certainly vulnerable to criticism, and Ford will have the opportunity to expose any weaknesses in his methodology during cross-examination and the presentation of their own expert testimony. *14.38 Acres of Land*, 80 F.3d at 1078. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at 1077. Therefore, the Court denies Ford's motion to exclude Meyer's testimony.

### III. FORD'S MOTION FOR SUMMARY JUDGMENT AS TO A.R.'S CLAIMS

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, 'the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case.'" *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010). The nonmovant "must come forward with specific facts showing that there is a genuine issue for

---

[5]Ford relies heavily on *Guy* and *Watkins*. They are distinguishable. In *Watkins*, the proposed expert failed to test the alternative design, despite having testified as to the importance of testing. *Watkins*, 121 F.3d at 992. Furthermore, he based his opinion on having "seen" certain types of conveyor systems, rather than basing it on any empirical support. *Id.* He also failed to produce any schematics or conduct any calculations to support his opinion. *Id.* In the present case, Meyer conducted an investigation, took measurements, compared the subject design to an exemplar, examined technical specifications, and calculated differences in performance between the subject design and the proposed alternative design. While he may not have provided as much support for his opinion as he could have, he provided *some* empirical support.

In *Guy*, the proposed expert did not provide *any* specific alternative design. *Guy*, 394 F.3d at 327. In the present case, Meyer proposed a specific alternative design that was employed by Ford in at least three other Explorer models.

trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

First, Ford argues that Plaintiffs can not meet their burden of proof without Meyer's testimony, which should be excluded. The Court denied Ford's motion to exclude Meyer's testimony. Therefore, this argument has no merit.

Next, Ford argues that – even with Meyer's testimony – Plaintiffs failed to establish a feasible alternative design for the mounting bracket which Plaintiffs allege caused A.R.'s injuries and death. Ford's argument on this point largely restates its argument on the motion to exclude Meyer's testimony. Meyer's testimony must only establish by a preponderance of the evidence that "there existed a feasible design alternative . . . that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." MISS. CODE ANN. § 11-1-63(f)(ii). Ford argues that a jury could only speculate as to whether Meyer's proposed alternative design would have prevented A.R.'s injuries, based on the alleged deficiencies in his testimony discussed above.

13

As the Court already noted, Meyer's expert testimony is not unassailable. There are weaknesses in his methodology which may be explored by opposing counsel during cross-examination. However, he presented some evidence to support a jury's conclusion that "there existed a feasible design alternative . . . that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." MISS. CODE ANN. § 11-1-63(f)(ii). It is undisputed that Ford employed the proposed alternative mounting bracket design in at least three other Explorer models. That fact, by itself, is sufficient to support a jury's conclusion that the alternative design would not have impaired the utility, usefulness, practicality, or desirability of the product. *See Std. Fire Ins. Co.*, 2008 U.S. Dist. LEXIS 107030 at *16.

Additionally, the Court believes that Meyer's measurements, calculations, and analysis regarding occupant displacement when the buckle stalk is bent in an outboard direction are sufficient to allow a jury to consider his opinion as to whether the alternative design would have prevented the injury. When addressing a motion for summary judgment, the Court must resolve factual issues in favor of the non-movant. *Sierra Club, Inc.*, 627 F.3d at 138. There is *some* basis for Meyer's testimony beyond mere speculation or conjecture. Therefore, there is *some* evidence which would support a jury's finding that the proposed alternative would have to a reasonable probability prevented the injury. Ford believes the evidence is weak, and Ford's expert testimony may even be stronger. However, those are issues for a jury to consider. Accordingly, the Court must deny Ford's motion for summary judgment.

## IV. CONCLUSION

For the reasons stated above, the Court denies Ford's Motion to Exclude the Testimony of

Steven E. Meyer and for Summary Judgment [150].

SO ORDERED AND ADJUDGED this 12th day of July, 2011.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE