**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**MATTHEW RILEY, et al.**                                              **PLAINTIFFS**

**v.**                                    **CIVIL ACTION NO. 2:09-CV-148-KS-MTP**

**FORD MOTOR COMPANY, et al.**                            **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Before the Court are Ford's Motion to Strike [180] the errata sheet submitted by James Koerber, and Ford's Motion to Exclude [154] the testimony of James Koerber. For the reasons stated below, the Motion to Strike [180] is **denied in part and granted in part**, and the Motion to Exclude [154] Koerber's testimony is **denied**.

### I. BACKGROUND

This is a wrongful death and product liability action stemming from an automobile accident on November 3, 2006. The Riley family was traveling east on Highway 98 in Marion County, Mississippi, in a 2002 Ford Explorer XLS. Plaintiff Matthew Riley was driving. Plaintiff Carmen Riley occupied the front passenger seat, while their children, Plaintiffs C.R. and A.R., sat in the back seat. All Plaintiffs were wearing seat belts.

Another vehicle attempted to pass Plaintiffs' Explorer and made contact with it. Plaintiffs' vehicle went off the road, rolling over several times in the process. All Plaintiffs suffered serious injuries. Carmen Riley and A.R. were partially ejected from the vehicle. Carmen Riley suffered serious and permanent injuries, while A.R. was killed.

In their First Amended Complaint, Plaintiffs advanced a variety of claims implicating both

the Mississippi Products Liability Act ("MPLA")[1] and Mississippi's wrongful death statute.[2] They alleged that the Explorer's restraint system failed as a result of design and manufacturing defects. They further alleged that its door latch system failed, and that its windows were not properly glazed. Finally, they alleged that Defendants failed to warn of the danger caused by the alleged defects. They included the following causes of action: strict liability, negligence, and failure to recall and/or retrofit. Finally, they seek a variety of damages, including punitive damages; medical expenses; lost earnings; and compensation for pain, suffering, and emotional distress.

In an order [267] entered June 23, 2011, the Court granted in part and denied in part Ford's Motion for Partial Summary Judgment [152]. The Court granted the motion as to: the MPLA claims and emotional damages claims of Plaintiffs C.R. and Matthew Riley; Matthew Riley's lost wages claims; all Plaintiffs' warning defect claims; all Plaintiffs' claims stemming from alleged defects in the door latch system and window glazing; and all Plaintiffs' claims stemming from Defendants' alleged failure to recall or retrofit the vehicle. However, the Court denied the motion as to: Matthew Riley and C.R.'s claims for loss of companionship and society; Matthew Riley and C.R.'s claims for damages attributable to the injuries and/or death of A.R. to which they were entitled as wrongful death beneficiaries; and all Plaintiffs' negligence claims. Finally, the Court held that Plaintiffs had not properly plead any bystander liability claim, and, therefore, no such claim was before the Court.[3]

The Court also granted in part and denied in part [268] Ford's Motion to Strike [244] the affidavit of Steven Meyer attached to Plaintiffs' response [231] to Ford's Motion to Exclude [150]

---

[1] MISS. CODE ANN. § 11-1-63.

[2] MISS. CODE ANN. § 11-7-13.

[3] The Court later denied [276] Plaintiffs' motion to file a Second Amended Complaint which included a bystander liability theory.

2

Meyer's testimony. The Court denied the motion as to: Meyer's testimony addressing belt spool-out; Meyer's testimony that belt spool-out generally occurs in rollover accidents; Meyer's testimony regarding other similar incidents of mounting bracket failure; Meyer's discussion of certain spit test data which allegedly displayed the effects of anchor deformation; Meyer's general observations regarding the strength of an aluminum rivet, including his assistant's "testing" the rivet by applying force by hand; and Meyer's discussion of belt geometry. The Court granted the motion as to: Meyer's testimony regarding other specific incidents of belt spool-out; Meyer's testimony regarding other specific incidents of retractor failure; Meyer's testimony regarding other similar incidents of B-pillar deformation, C-pillar deformation, and D-ring movement; any calculations, testing, or analysis regarding the strength of any aluminum rivet that was not timely disclosed to Defendants, including Meyer's discussion of tensile strength ratings; and Meyer's belt geometry diagrams.

On July 12, 2011, the Court granted in part and denied in part Key Safety's Motion for Summary Judgment [289]. The Court denied the motion as to: the foreseeability of the alleged danger posed by the subject vehicle, the wrongful death claims of Plaintiffs C.R. and Matthew Riley, the loss of companionship or society claims of Plaintiffs C.R. and Matthew Riley, and Plaintiffs' negligence claims. However, the Court granted the motion as to: the MPLA claims of Plaintiffs C.R. and Matthew Riley; Plaintiff Matthew Riley's claim for lost wages; Plaintiffs' warning defect claims; Plaintiffs' claims regarding Defendants' alleged failure to retrofit or recall the subject vehicle; any manufacturing defect claim asserted by Plaintiffs; and any MPLA claim asserted by Plaintiffs premised upon the manufacturing, assembly, or installation of the restraint system. Finally, the Court ruled that Plaintiffs had not properly plead a bystander liability theory, and that no such claim was before the Court.

On the same day, the Court denied Ford's Motion to Exclude the Expert Testimony of Steven E. Meyer and for Summary Judgment [291]. The Court noted that Meyer's testimony was not wholly unsupported by empirical evidence. Therefore, the Court held that the testimony's weaknesses went toward its weight, rather than its admissibility. Next, the Court held that Plaintiffs had presented some evidence which would support a jury's finding that Meyer's proposed alternative restraint design would have to a reasonable probability prevented A.R.'s injury. Therefore, the Court denied Ford's motion for summary judgment.

On July 15, 2011, the Court denied Plaintiffs' motion in limine [162] as to evidence that A.R. was not in a child restraint seat or booster seat at the time of the accident. The Court noted that the evidence was not admissible as evidence of Plaintiffs' comparative or contributory negligence. However, such evidence is admissible to show causation or to illustrate the nature of the accident, as long as it is otherwise admissible and accompanied by a limiting instruction. The Court ordered the parties to confer and attempt to agree on a proposed limiting instruction prior to the start of trial.

On July 19, 2011, the Court granted Defendants' motions for summary judgment as to Plaintiffs' punitive damages claim. The Court held that Plaintiffs had failed to provide clear and convincing evidence that Defendants acted willfully, wantonly, fraudulently, or with reckless disregard for the safety of others. At best, Plaintiffs' evidence demonstrated mere negligence, rather than the sort of egregious conduct which merits punitive damages.

On July 25, 2011, the Court denied Plaintiffs' Motion to Exclude testimony by Key Safety's expert witnesses. The Court held that Plaintiffs had failed to show that they would be prejudiced by allowing the testimony.

Finally, earlier today – July 26, 2011 – the Court denied Plaintiffs' Motion to Strike the

Defendants' proposed jury instructions. The Court also granted in part and denied in part Plaintiffs' Motion to Exclude certain testimony by Master Sergeant Ronald Rayburn. The Court denied Plaintiffs' motion as to Rayburn's lay opinion regarding the cause of the accident from which this case stems. However, the Court granted the motion as to Rayburn's lay opinions regarding the cause of Plaintiffs' injuries and the performance of the seat belts in the subject vehicle. The Court held that Rayburn could testify as to his personal observations, but that if Defendants wished to proceed beyond that – into the realm of opinions – they would have to make a proffer and demonstrate that the testimony meets the requirements of Rule 701.

## II. MOTION TO STRIKE [180]

Defendants deposed Plaintiffs' expert, James Koerber, on March 14, 2011, and mailed the deposition transcript to Plaintiffs' counsel on March 25, 2011. Ford filed its dispositive motions on April 15, 2011 – including a motion to exclude Koerber's testimony [154]. On April 23, 2011, Koerber executed an errata sheet altering his deposition testimony, and Ford received the errata sheet on April 28, 2011. Ford argues that the errata sheet should be stricken for failure to comply with Rule 30(e); it contends that Koerber failed to provide any reason for the changes to his testimony. Ford further argues that the errata sheet is an improper attempt by Plaintiffs' expert to strengthen his testimony in response to Ford's *Daubert* motion.

Rule 30(e) provides:

On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

  (A) to review the transcript or recording; and

  (B) if there are changes in the form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e)(1). "Rule 30(e) does not provide any exceptions to its requirements." *Reed v. Hernandez*, 114 F. App'x 609, 611 (5th Cir. 2004). The rule plainly allows a party to make changes in "form or *substance*." FED. R. CIV. P. 30(e)(1)(B) (emphasis added). Therefore, this Court has previously allowed substantive changes to the content of a deposition. *Walker v. George Koch Sons, Inc.*, 2008 U.S. Dist. LEXIS 81919, at *7 (S.D. Miss. Sept. 18, 2008) (where deponent's changes were contradictory to his prior testimony, Court allowed them subject to certain remedial measures); *see also Betts v. GMC*, No. 3:04-CV-169, 2008 WL 2789524, at *2 (N.D. Miss. July 16, 2008) (allowing substantive changes to deposition testimony). However, the Court has also ruled that parties making substantive changes to their deposition testimony must provide a sufficient explanation for the changes. *Crawford v. Mare Mortg., LLC*, No. 4:05-CV-186, 2006 WL 1892072, at *1 (S.D. Miss. July 10, 2006). One-word, conclusory explanations are not sufficient. *Id.* "The term 'reason' should be interpreted in its most common sense meaning: a statement explaining the deponent's reasons for making the change." *Betts*, 2008 WL 2789524 at *2.

Courts that have allowed substantive changes under Rule 30(e) – including this Court – have employed "remedial measures to limit the potential for abuse," including "reopening the deposition for limited purposes, requiring the deponent to pay the costs of reopening his deposition, and ordering that the original and changed answers, as well as the reasons for the changes, remain in the record" for use on summary judgment motions and at trial. *Walker*, 2008 U.S. Dist. LEXIS 81919 at *8. This Court previously noted that its goal in following the majority approach was to further "the purpose of the discovery process – to allow the parties to elicit the true facts of a case before trial." *Id.* at *9. Furthermore, the Court's decision was guided by the fact that the errata sheet in question "was submitted prior to the filing of a motion for summary judgment or other dispositive

6

motion." *Id.* at \*9 n. 4 (citing *Innovative Mktg. & Tech., L.L.C. v. Norm Thompson Outfitters*, 171 F.R.D. 203, 205 (W.D. Tex. 1997)).

In summary, the rules regarding amendments to deposition testimony via Rule 30(e) are murky, at best. The consensus view in this state appears to be that errata sheets may be used to make substantive changes to deposition testimony, if the opposing party is granted the benefit of certain remedial measures. *Id.* at \*7; *Betts*, 2008 WL 2789524 at \*2. Further, the errata sheet must include an explanation of why the change is necessary. *Crawford*, 2006 WL 1892072 at \*1; *Betts*, 2008 WL 2789524 at \*2. One-word, conclusory explanations are not sufficient. *Crawford*, 2006 WL 1892072 at \*1. Finally, the Court should consider whether the changes were made in response to a dispositive motion. *Walker*, 2008 U.S. Dist. LEXIS 81919 at \*9, n. 4.

The Court initially holds that Ford's motion is denied as to the first two changes on the errata sheet. Ford's counsel requested that information and agreed that Koerber would provide it on his errata sheet.[4] Koerber complied with Rule 30(e)'s requirements, as the errata sheet includes the changes and the reasons for making them. No remedial measures are necessary, as Ford consented to Koerber's provision of the information via the errata sheet.

However, the Court grants Ford's motion as to the remaining changes. First, the explanations provided by Koerber are insufficient. As explained above, the federal courts in this state require more than conclusory, one-word "reasons" for compliance with Rule 30(e). *Crawford*, 2006 WL 1892072 at \*1; *Betts*, 2008 WL 2789524 at \*2. Plaintiffs argue that the changes "speak for themselves," but such arguments have been rejected by Mississippi's federal courts. *Crawford*, 2006

---

[4]The first change addresses previous cases where Koerber applied a 49% personal consumption factor, and the second change addresses how much Koerber has billed Plaintiffs' counsel in this case.

7

WL 1892072 at *1; *Betts*, 2008 WL 2789524 at *2.

Second, this Court has suggested that it would not view substantive changes to deposition testimony favorably if they were submitted after "the filing of a motion for summary judgment or other dispositive motion." *Walker*, 2008 U.S. Dist. LEXIS 81919 at *9 n. 4. In this case, it is apparent that the third, fourth, and fifth changes on the errata sheet are direct responses to Ford's Motion to Exclude [154] Koerber's testimony – attempts to bolster the testimony before the Court addresses the *Daubert* motion. Two factors contribute to this conclusion: the timing of Koerber's execution of the errata sheet, and the nature of his amendments. Koerber executed the errata sheet near the end of the time period allowed under Rule 30, after Ford filed its *Daubert* motion. This factor is not conclusive by itself, as the parties in this case have displayed a tendency to put off litigation tasks until the last minute. However, the changes appear to be direct responses to arguments raised by Ford in its *Daubert* motion.

Third, there is insufficient time before trial to allow Ford a supplemental deposition, as the Court has previously done when a witness provides substantive changes to his deposition testimony. *See Id.* at *8. Although Ford could still question Koerber at trial regarding his original testimony, the changes on the errata sheet, and his reasons for making the changes, it would be deprived of the benefit of a deposition before trial. The purpose of depositions is to give parties prior notice of the testimony to be offered at trial. Allowing the changes without giving Ford the opportunity to reopen Koerber's deposition would deprive it of that benefit.

No single issue outlined above is, by itself, determinative on this decision. Indeed, the "changes" to Koerber's testimony are analogous to a witness's elaboration on a previous answer, and the Court doubts whether Ford would be greatly prejudiced by allowing them. However,

8

Koerber's "reasons" for the changes are insufficient under prior decisions by the federal courts in this state, and there is no time to reopen Koerber's deposition before trial. Furthermore, the Court should discourage the submission of errata sheets to bolster testimony in response to a dispositive motion or *Daubert* motion. That is clearly Plaintiffs' intent here.[5]

For the reasons stated above, the Court denies in part and grants in part Ford's Motion to Strike [180] Koerber's errata sheet. The Court denies the motion as to the first two changes and grants the motion as to the third, fourth, and fifth changes.

### III. MOTION TO EXCLUDE [154]

Ford also filed a Motion to Exclude [154] the expert testimony of James Koerber on the basis that it is unreliable.[6] Ford challenges Koerber's testimony as to the lost future earnings of the

---

[5]The Court's decision here is influenced by Plaintiffs' displayed tendency to neglect the development of their case during discovery and later attempt to remedy that neglect in their briefing on dispositive motions. Plaintiffs submitted an affidavit by their expert Steven Meyer in response to Ford's motion to exclude his testimony, and they submitted an affidavit from James Koerber in response to Ford's motion to exclude his testimony, rather than simply relying on each expert's report and deposition testimony. Ford filed a motion to strike Meyer's affidavit and objected to the Court's consideration of Koerber's affidavit, and, of course, the Court presently addresses Ford's motion to strike Koerber's errata sheet. In summary, Plaintiffs' failure to adequately develop their case during the discovery period led to the filing of at least two additional motions which the Court is now forced to address after over a dozen motions were filed on the discovery deadline – which had already been pushed closer to the trial date at the parties' request.

The Court does not typically criticize the work of the attorneys practicing before it. Having practiced law for many years, the undersigned is aware of the myriad factors that can influence the life of a case such as this one. Nonetheless, the Court encourages counsel on both sides of this case to examine the record, determine what caused the "bottleneck" of motions in this case, and adjust their litigation practices accordingly. The Court's ability to efficiently administer justice is dependant, in large part, upon the work of the attorneys practicing before it.

[6]Ford also argues that Koerber's testimony should be excluded because it will not help the jury. There is no difference between these two arguments, as Ford argues that the testimony would be unhelpful because of its unreliability.

deceased Plaintiff, A.R.

*A.*     **Daubert** *Standard*

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Expert testimony "serves to inform the jury about affairs not within the understanding of the average man." *United States v. Moore*, 997 F.2d 55, 57 (5th Cir. 1993). Therefore, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). "Whether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, who is in the best position to determine both the claimed expertise of the witness and the helpfulness of his testimony." *Sullivan v. Rowan Cos.*, 952 F.2d 141, 144 (5th Cir. 1992).

"[W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). In *Daubert*, the Supreme Court provided a nonexclusive list of "'general observations' intended to guide a district court's evaluation of scientific evidence," including: "'whether [a theory or technique] can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' the 'known

or potential rate of error,' and the 'existence and maintenance of standards controlling the technique's operation,' as well as 'general acceptance.'" *Id.* at 989 (quoting *Daubert*, 509 U.S. at 593-94, 113 S. Ct. 2786). The Fifth Circuit Court of Appeals has observed:

> Not every guidepost outlined in *Daubert* will necessarily apply to expert testimony based on engineering principles and practical experience, but the district court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" is no less important.

*Id.* at 990-91 (quoting *Daubert*, 509 U.S. at 592-93, 113 S. Ct. 2786).

The reliability of proposed expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). "[T]he expert's testimony must be reliable at each and every step or it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 725 (5th Cir. 2009) (alteration original). Therefore, "[t]he . . . reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

"Overall, the trial court must strive to ensure that the expert, 'whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* The testimony must be supported by "more than subjective belief or unsupported speculation." *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. 2786). While the Court should focus solely on the proposed expert's "principles and methodology,

11

not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, 113 S. Ct. 2786, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

While the Court must "ensure expert witnesses have employed reliable principles and methods in reaching their conclusions," it does not judge the proposed experts' conclusions. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* at 1077. Nonetheless, "[t]he proponent of expert testimony . . . has the burden of showing that the testimony is reliable," *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004), and must establish the admissibility requirements "by a preponderance of the evidence." *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).

### B.   *Reliability of Koerber's Testimony*

Calculating the damages of the representatives of a decedent "involves four steps: estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value." *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983). "[C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of the injury. To this amount other income incidental to work, such as fringe benefits, should be added. From it, the fact-finder should subtract amounts

the wage earner would have been required to pay, such as" income tax, work expenses, and living expenses. *Id.*

Ford's motion relates to one of the factors subtracted from the income that A.R. would have presumably earned over her lifetime. In calculating lost future earnings, economists employ a "consumption factor." They assume that a decedent would have consumed a certain percentage of their post-tax income on the basic expenses of living. This consumption factor is derived from a variety of factors, including gender, the number of people in a household, and the predicted annual wages of the decedent. Koerber utilized a 49.18% consumption factor. Ford argues that the appropriate consumption factor should be somewhere between 72.6% and 97.7%.

   *1.     Two-Person Household*

First, Ford argues that Koerber used the consumption factor for a two-person household, rather than a single-person household, despite his assumption that A.R. would have been part of a single-person household. Ford contends that this renders Koerber's testimony unreliable, but, as the Court shall explain, that is not necessarily the proper conclusion under *Daubert*.

Koerber relied upon tables of average annual expenditures based on survey results compiled by the Bureau of Labor Statistics. His report contains a table of figures from the survey which addresses consumer expenditures by two-person households. During his deposition, Koerber pointed out that although the survey was for "two-person" households, the average two-person household only had 1.3 earners. He further noted that the table for "single-person" households indicated that the average single-person household had less than one earner. He stated it may be as low as "one half of one person." Koerber reiterated this point in an affidavit submitted by Plaintiffs in support of their response to Ford's *Daubert* motion. Ford objects to the Court's consideration of the

13

affidavit, but Ford did not object to the Court's consideration of the actual tables from the Patton-Nelson study upon which Koerber relied. In fact, Ford's expert also relied on the Patton-Nelson study, and admitted that there was debate among economists as to the appropriate levels of personal expenditures to be applied in calculating damages in wrongful death cases.

According to the Patton-Nelson tables of average expenditures, single-person households contained, on average, 0.6 earners per household, while two-person households contained, on average, 1.3 earners per household. Koerber explained during his deposition that the survey data can be skewed by outliers, such as respondents who are retirees and do not report social security, medicare, or other benefits as income. In fact, the single-person Patton-Nelson table shows that the average number of persons sixty-five years of age or older in single-person household was 0.3.

Ford failed to address this point in its rebuttal, but it is at least an arguable reason to utilize the consumption factor for a two-person household, rather than a single-person household. The parties apparently agree that A.R.'s household – for purposes of projecting her lost wages – would include one earner, and 1.3 earners is closer to that number than 0.6. Moreover, the Court is certain that if one compares an actual single-person household to the "average" single-person household as portrayed in the Patton-Nelson study, one will find any number of differences. Models are based on averages, and the issue here is which model more closely fits A.R.'s imagined single-person household. Koerber pointed to at least one factor, the number of earners in the household, which indicates that the two-person model is a better fit for what the parties assume A.R.'s household would look like if she had survived. Therefore, Plaintiffs having produced that evidence to show the reliability of Koerber's testimony, the burden shifts to Ford to show that the single-person model is a better fit. Ford has failed to do so. Accordingly, Koerber's use of the two-person consumption

factor, by itself, is not sufficient reason to exclude his testimony.

The Court further notes that the Mississippi Supreme Court has held that the consumption factor used in a lost wages calculation "is another factor which may be argued by the parties to the finder of fact." *Greyhound Lines, Inc. v. Sutton*, 765 So. 2d 1269, 1279 (Miss. 2000). Although this is not binding authority in this *Daubert* determination,[7] the Court finds it persuasive, particularly in the absence of any Fifth Circuit case law addressing the issue. *But see Pirolozzi v. Stanbro*, No. 5:07-CV-798, 73 Fed. R. Serv. 3d 766, 2009 U.S. Dist. LEXIS 42575, at *17-*19 (N.D. Ohio May 20, 2009) (allowing testimony by wrongful death plaintiff's economic damages expert, despite the fact that the expert failed to utilize *any* consumption factor).

2.      *Two-Person Income*

Next, Ford argues that Koerber's testimony is unreliable because he used the personal consumption rate for a household with significantly more income than he estimates A.R. would have had. Koerber estimated that A.R.'s starting annual income would have been $22,814 if she acquired a high school diploma or, alternatively, $34,898 if she acquired a four-year college diploma. However, Koerber used the expenditure numbers for a two-person household with a combined income of $66,379.

As explained above, Koerber got his raw data from a study which used the results from surveys conducted by the National Bureau of Labor Statistics. According to that study, the average income for a two-person household in the United States, after taxes, was $66,379. The study also includes a wide variety of other data, including the amount of money two-person households spent

---

[7]*Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. ) ("[T]he Federal Rules of Evidence control the admission of expert testimony.").

15

on housing, different types of food, utilities, housekeeping supplies, clothing, and transportation. The data is presented in a table sorted by income levels.[8] The first column contains the national averages for two-person households, and the succeeding columns give averages specific to different income brackets.

Accordingly, Koerber could have used the data specific to two-person households making $20,000-$29,999 a year for A.R.'s high school diploma scenario, or the data specific to two-person households making $30,000 to $39,999 a year for A.R.'s college degree scenario. Instead, he used the average data for *all* two-person households. The Court has pored over Plaintiffs' briefing, the transcript of Koerber's deposition, and his expert report, and the record does not contain any explanation for why Koerber chose to use the overall national averages, rather than the data specific to certain income brackets.

Despite this obvious weakness in Koerber's testimony, the Court believes excluding his testimony would be an extreme measure. It is undisputed that the Patton-Nelson tables are generally relied upon by economists. Koerber testified that there were only slight differences between his analysis and the analysis of Carl Brooking, Ford's expert. In fact, Brooking appears to have also used the Patton-Nelson figures as a starting point and modified them, as Koerber did. Therefore, the Court does not believe that Koerber's use of the data for the average two-person household, as opposed to the data for two-person households in specific income brackets, renders his testimony completely unreliable. It still has some value to the jury in understanding how economists determine damages in a case such as this one. Furthermore, Defendants will have ample opportunity to cross-examine Koerber on these very issues.

---

[8] The data may be found at Documents 196-9, and 196-10 on the docket.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land*, 80 F.3d at 1077. Ford's argument here concerns the factual assumptions underlying Koerber's analysis – i.e. whether he used the correct data set to derive the consumption factor. Accordingly, this is a matter that should be left to the jury.

## IV. CONCLUSION

For the reasons stated above, Ford's Motion to Strike [180] Koerber's errata sheet is **denied in part and granted in part**, and Ford's Motion to Exclude [154] Koerber's testimony is **denied**.

SO ORDERED AND ADJUDGED this 26th day of July, 2011.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE